UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYL ROSE SCHAEFFER,

      Plaintiff,                                    Case No. 4:20-cv-12620

                                    District Judge Matthew F. Leitman

v.                                                        Magistrate Judge Kimberly G. Altman

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I.     Introduction

This is a social security case.  Plaintiff Cheryl Rose Schaeffer (Schaeffer) brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits (DIB) under the Social Security Act (the Act).  Both parties have filed summary judgment motions (ECF Nos. 15, 18), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ) conclusion that Schaeffer is not disabled under

1

the Act. Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 18) be GRANTED, Schaeffer's Motion for Summary Judgment (ECF No. 15) be DENIED, and the ALJ's decision be AFFIRMED.

## II.    Background

### A.    Procedural History[1]

Schaeffer was 47 years old at the time of her alleged onset date of February 26, 2016. (ECF No. 13, PageID.177). She previously worked as a clerk typist, counselor's assistant, and a court typist. (*Id.*, PageID.245). Schaeffer alleged disability due to arthritis, high cholesterol, anxiety, depression, PTSD, use of a cane to ambulate, Veterans Affairs (VA) disability rating of 70%, military sexual trauma, back surgery, and left ankle surgery. (*Id.*, PageID.178).

After Schaeffer's application was denied at the initial level on October 2, 2018 (*Id.*, PageID.184), she timely requested an administrative hearing, which was held on July 22, 2019, before the ALJ. (*Id.*, PageID.106-155). Schaeffer testified at the hearing, as did a vocational expert (VE). (*Id.*).

---

[1] This is Schaeffer's third application for DIB. (ECF No. 13, PageID.178). Schaeffer filed for benefits in 2009 and 2012; both applications were denied. (*Id.*).

2

Schaeffer testified[2] that she lived with her ex-husband and daughter.  (*Id.*, PageID.113).  Schaeffer had three associate degrees and entered military service when she was 30 years old.  (*Id.*, PageID.114).  While in the military, Schaeffer drove tractor trailers and worked in the mailroom.  (*Id.*, PageID.115).  Schaeffer changed jobs because she sprained her ankle and had other difficulties due to a previously fractured femur.  (*Id.*, PageID.118-119).

Schaeffer suffered from a number of physical impairments, but the impairments that most affected her involved her back and ankles.  (*Id.*, PageID.124-125).  Both of Schaeffer's ankles were reconstructed.  (*Id.*, PageID.125).  Schaeffer could only stand if she was holding onto something such as her cane.  (*Id.*, PageID.126-127).  She was a fall risk because she suffered from vertigo.  (*Id.*, PageID.127-128).  However, back in 2017, Schaeffer was able to stand for 10 to 15 minutes without the use of an assistive device.  (*Id.*, PageID.127).  She would then need to sit down because of back pain.  (*Id.*).  At that time, Schaeffer could sit for about an hour before needing to stand.  (*Id.*, PageID.128).

Schaeffer has a history of alcohol and drug abuse.  (*Id.*, PageID.128).  She received impatient treatment in July 2016 relating to her alcohol abuse.  (*Id.*,

---

[2] Schaeffer's testimony is difficult to follow as she struggled to remember dates related to her various alleged impairments.

PageID.128-129).  Schaeffer no longer used illegal drugs but did use CBD oil.
(*Id*., PageID.129).  She also stopped taking prescription medications she obtained
from the VA and tried to maintain a healthy lifestyle.  (*Id*.).  The only prescription
medication she took was Klonopin to help her sleep.  (*Id*., PageID.131).  Schaeffer
did not take over-the-counter medications.  (*Id*.).  When Schaeffer was taking
prescription medications, she suffered from tinnitus, nausea, diarrhea, and
difficulty "think[ing] straight."  (*Id*., PageID.132).  Schaeffer had discussed taking
additional medications with her psychiatrist to treat her bipolar disorder, and at
some point was prescribed additional psychotropic medications which she
voluntarily stopped taking.  (*Id*., PageID.135-136).

Between 2016 and 2017, Schaeffer took online classes.  (*Id*., PageID.132).
She failed the classes because she "was having trouble focusing."  (*Id*.,
PageID.133).  Shaeffer also received a DUI during that period.  (*Id*.).  Schaeffer's
daughter helped care for her.  (*Id*., PageID.133-134).  Schaeffer also attended an
inpatient program for military sexual trauma (MST).  (*Id*., PageID.134-135).

Schaeffer spent most of her time in her bedroom where she had a
microwave, hot plate, refrigerator, and coffee maker.  (*Id*., PageID.142).  Schaeffer
enjoyed "artistic things" and was trying to write a book; she also maintained a
nightmare diary.  (*Id*., PageID.141-144).  Schaeffer stayed in her bedroom because
of both her physical and mental impairments.  (*Id*., PageID.142).  She no longer

4

trusted people.  (*Id*.).  Schaeffer tried to take a walk every day, but she did not feel safe in her neighborhood.  (*Id*., PageID.143).  Her ex-husband grocery shopped for her.  (*Id*.).  When she was out in public, Schaeffer believed she saw the men who raped her.  (*Id*., PageID.144-145).

On October 25, 2019, the ALJ issued a written decision finding that Schaeffer was not disabled.  (*Id*., PageID.50-63).  On August 11, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (*Id*., PageID.44-46).  Schaeffer timely filed for judicial review of the final decision.  (ECF No. 1).

## B.     Medical Evidence[3]

July 21, 2016 notes by Rebecca L. Voelker indicate that Schaeffer was seeking assistance with alcohol abuse.  (ECF No. 13, PageID.399-400).  Schaeffer indicated her strengths were as follows: "Very good at working with people.  I like education.  I'm good at arts and crafts.  I'm good at cleaning and cooking."  (*Id*.,

---

[3] Schaeffer only raises issues concerning her alleged mental impairments. Accordingly, records addressing her alleged physical impairments will not be summarized in the medical evidence section of this Report.  Additionally, the discussion of the medical evidence is limited to records pertaining to Schaeffer's condition between February 26, 2016 (alleged onset date) and December 31, 2017 (date last insured).  *See Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 n.8 (S.D. Ohio 2012) ("In determining whether a Plaintiff is 'disabled,' the ALJ generally only considers evidence from the alleged disability onset date through the date last insured.").

PageID.400).  Schaeffer reported that she was drinking between a fifth and a half to two fifths of liquor each day.  (*Id*., PageID.402).

On November 8, 2016, Schaeffer was seen by Jill K. Roling, a social worker, for consideration for specialized outpatient treatment by the PTSD Clinical Team (PCT).  (*Id*., PageID.287).  Schaeffer's referring provider indicated that she had adjustment disorder (related to MST).  (*Id*.).

Roling's January 3, 2017 notes indicate that Schaeffer had no impairment in thought process or communication.  (*Id*., PageID.1015).  Her mood was euthymic and congruent with affect.  (*Id*.).  Roling also noted that the PCT had been unable to complete admission/intake process because of Schaeffer's inability to focus.  (*Id*., PageID.1016).

Psychiatrist Joseph A. Barber, M.D.'s January 9, 2017 notes indicate that Schaeffer had received a DUI for which she would be sentenced on February 9, 2017.  (*Id*., PageID.1010).  Schaeffer reported that she was clean and sober and was sleeping better.  (*Id*.). Schaeffer's fund of knowledge was good.  (*Id*.).  Her mood was " 'calmer' " and affect pleasant.  (*Id*., PageID.1011).  She experienced less anxiety.  (*Id*.).  Schaeffer's judgment and insight were fair.  (*Id*.).

Dr. Barber again noted on February 6, 2017, that Schaeffer was being sentenced for a DUI later that week.  (*Id*., PageID.986).  Schaeffer reported that she had a good appetite but disrupted sleep.  (*Id*.).  She further reported that she

was attending Alcoholics Anonymous (AA) twice each week. (*Id.*). Schaeffer's fund of knowledge was good. (*Id.*). Her mood was " 'stable' " and affect pleasant. (*Id.*). She experienced intermittent anxiety. (*Id.*, PageID.987). Schaeffer's judgment and insight were fair. (*Id.*). Dr. Barber instructed Schaeffer to stop taking melatonin and start taking doxepin. (*Id.*).

February 8, 2017 notes from psychologist Wayne Roffer indicate that Schaeffer was distressed about possible incarceration. (*Id.*, PageID.983). Schaeffer's attention and concentration, short- and long-term memory, and hygiene/grooming were all within normal limits. (*Id.*, PageID.983-984). She was guarded but appeared "clean and neat." (*Id.*, PageID.984). Her mood was dysthymic and affect congruent to mood and topic of conversation. (*Id.*). Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id.*).

Roffer noted on February 21, 2017, that Schaeffer was on house arrest for the next six months. (*Id.*, PageID.981). He also noted that Schaeffer had a "tendency to anticipate worst case scenarios and anticipate long-term consequences." (*Id.*). Schaeffer's attention and concentration and short- and long-term memory were within normal limits. (*Id.*). She was cooperative. (*Id.*). Her mood was depressed. (*Id.*). Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id.*).

7

On February 28, 2017, Schaeffer reported to Roffer that she was depressed and had limited motivation. (*Id*., PageID.979). She further reported "feeling overwhelmed at times." (*Id*.). Schaeffer's attention and concentration and short- and long-term memory were within normal limits. (*Id*.). She was cooperative. (*Id*.). Her mood was dysthymic. (*Id*.). Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id*., PageID.980).

Dr. Barber's March 6, 2017 notes indicate that Schaeffer reported doxepin to be ineffective in helping her insomnia. (*Id*., PageID.988). Dr. Barber recommended switching to Rozerem. (*Id*.).

Roffer's March 8, 2017 notes indicate that Schaeffer reported being well. (*Id*., PageID.975). Schaeffer's attention and concentration, short- and long-term memory, and hygiene and grooming were all within normal limits. (*Id*., PageID.975). She was guarded and appeared "clean and neat." (*Id*.). Her mood was labile and affect congruent to mood. (*Id*.). Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id*., PageID.976).

On March 14, 2017, Roffer again noted that Schaeffer reported to being well. (*Id*., PageID.973). Schaeffer's attention and concentration, short- and long-term memory, and hygiene and grooming were all within normal limits. (*Id*., PageID.974). She was guarded and appeared "clean and neat." (*Id*.). Her mood

was good and affect congruent to mood.  (*Id*.).  Schaeffer's insight, judgment, and level of impulse control were all fair.  (*Id*.).

Roffer's March 22, 2017 notes indicate that Schaeffer was crying during the session.  (*Id*., PageID.966).  Schaeffer reported that she was not doing well and was experiencing a lot of physical pain.  (*Id*.).  She further reported feeling powerless and hopeless on top of experiencing severe depression.  (*Id*.).  Schaeffer indicated that she had to put her dog down and expressed that she wanted to " 'go to sleep as well,' " however, she denied plan or intent to harm herself.  (*Id*.).  Schaeffer's attention and concentration were poor.  (*Id*.).  She was cooperative.  (*Id*., PageID.967).  Her mood was depressed and irritable.  (*Id*.).  Schaeffer's insight, judgment, and level of impulse control were all poor.  (*Id*.).

On March 29, 2017, Roffer noted that Schaeffer reported to be doing well.  (*Id*., PageID.963-964).  Schaeffer's attention and concentration, short- and long-term memory, and speech quality were all within normal limits.  (*Id*., PageID.965).  She was cooperative.  (*Id*.).  Her mood was " 'much better.' "  (*Id*.).  Schaeffer's insight, judgment, and level of impulse control were all fair.  (*Id*.).

Roffer's April 11, 2017 notes indicate that Schaeffer reported pain and expressed frustration with being treated as an addict by the VA in regard to her request for pain medication.  (*Id*., PageID.960).  She further reported that she had stopped taking clonazepam and was having sleep difficulties.  (*Id*., PageID.961-

963).  Schaeffer's short- and long-term memory, appearance/dress, and speech quality were all within normal limits while her concentration was fair.  (*Id.*, PageID.961).  She was cooperative and appeared "clean and neat."  (*Id.*).  Her mood was depressed and irritable and affect varied from bright to blunt.  (*Id.*).  Schaeffer's judgment and level of impulse control were both fair while her insight was limited.  (*Id.*).

On May 10, 2017, Schaeffer had an appointment with Roffer who noted that Schaeffer "continue[d] to heal following the loss of her father and brother less than 24 hours apart."  (*Id.*, PageID.957).  Schaeffer's attention and concentration, short- and long-term memory, appearance/dress, and speech quality were all within normal limits.  (*Id.*, PageID.958).  She was cooperative and appeared "clean and neat."  (*Id.*).  Her mood was variable and affect mood congruent.  (*Id.*).  Schaeffer's insight, judgment, and level of impulse control were all fair.  (*Id.*).

At a preoperative consultation on May 17, 2017, Schaeffer admitted to buying Vicodin on the street and taking two tablets a day for her right ankle pain because her orthopedic surgeons refused to prescribe pain medication.  (*Id.*, PageID.370).

Also on May 17, 2017, Schaeffer had an appointment with Roffer who noted that her "[m]ood and affect [were] significantly worse than last week, even considering recent traumatic events in her life."  (*Id.*, PageID.953).  Schaeffer

reported that all she wanted to do was sleep. (*Id.*). She further reported that she was not eating three meals each day. (*Id.*). Schaeffer's attention and concentration, short- and long-term memory, and appearance/dress were all within normal limits. (*Id.*, PageID.953-954). She was cooperative and appeared "clean and neat." (*Id.*, PageID.953). Her mood was depressed and affect flat. (*Id.*, PageID.954). Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id.*).

Roffer's June 1, 2017 notes indicate that Schaeffer reported increased symptoms of depression without suicidal ideation. (*Id.*, PageID.932). Schaeffer's attention and concentration, short- and long-term memory, and appearance/dress were all within normal limits. (*Id.*, PageID.933). She was cooperative and appeared "clean and neat." (*Id.*). Her mood was depressed and affect flat. (*Id.*). Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id.*).

On June 15, 2017, Schaeffer reported to Roffer that she "[c]ontinue[d] to struggle with depression but ha[d] been working on staying as busy as possible." (*Id.*, PageID.916-917). Schaeffer's attention and concentration, short- and long-term memory, appearance/dress, and speech quality were all within normal limits. (*Id.*, PageID.917). She was cooperative and appeared "clean and neat." (*Id.*). Her mood was dysthymic and affect constricted. (*Id.*). Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id.*).

11

July 27, 2017 notes from Roffer indicate that Schaeffer reported to be doing well.  (*Id*., PageID.908).  Schaeffer's attention and concentration, and short- and long-term memory were all within normal limits.  (*Id*.).  She was cooperative.  (*Id*.).  Her mood was good.  (*Id*.).  Schaeffer's insight was fair, and judgment and level of impulse control were both good.  (*Id*.).

On August 7, 2017, Jessica A. Keith, a clinical psychologist, assessed whether Schaeffer could participate in a residential program after her house arrest following her second DUI ended.  (*Id*., PageID.344-345).  Schaeffer was "assessed by the primary therapist to be at no imminent risk for harm to self or others and is capable of living independently in a residential treatment milieu with minimal supervision."  (*Id*., PageID.345).  Ultimately, it was determined that so long as Schaeffer stopped taking clonazepam for the duration of the program then she could attend.  (*Id*., PageID.347-348).

August 10, 2017 notes from Roffer indicate that Schaeffer had "reported increased depression precipitated by pain."  (*Id*., PageID.901).  Schaeffer's attention and concentration, and short- and long-term memory were all within normal limits.  (*Id*., PageID.901-902).  She was cooperative.  (*Id*., PageID.901).  Her mood was depressed and frustrated.  (*Id*., PageID.902).  Schaeffer's insight, judgment, and level of impulse control were all fair.  (*Id*.).

12

On August 23, 2017, Schaeffer had an appointment with Roffer and she Schaeffer reported that she "[h]ad an anxious reaction recently attending a school function for her daughter." (*Id.*, PageID.897-898).  She indicated that her anxiety had worsened since the deaths of her father and brother. (*Id.*).  Schaeffer's attention and concentration, short- and long-term memory, appearance/dress, psychomotor activity, and speech quality were all within normal limits. (*Id.*).  She was cooperative and appeared "clean and neat." (*Id.*).  Her mood was dysthymic and frustrated and affect congruent to topic of conversation. (*Id.*).  Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id.*).

August 30, 2017 notes from Roffer indicate that Schaeffer reported to be "doing well." (*Id.*, PageID.895).  Her "[v]oice sounded optimistic and energized." (*Id.*).  Schaeffer's attention and concentration, short- and long-term memory, and speech quality were all within normal limits. (*Id.*, PageID.896).  She was cooperative. (*Id.*).  Her mood was good. (*Id.*).  Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id.*).

On September 6, 2017, Roffer's notes indicate that Schaeffer reported "depression with accompanying difficulties, specifically motivation and energy." (*Id.*, PageID.892).  Schaeffer's attention and concentration, short- and long-term memory, appearance/dress, psychomotor activity, and speech quality were all within normal limits. (*Id.*, PageID.892-893).  She was cooperative and appeared

13

"clean and neat." (*Id*., PageID.893).  Her mood was dysthymic and affect blunt. (*Id*.).  Schaeffer's insight, judgment, and level of impulse control were all fair. (*Id*.).

Roffer's September 13, 2017 notes indicate that Schaeffer reported that she continued to struggle with depression and pain post-surgery.  (*Id*., PageID.890). Schaeffer's attention and concentration, short- and long-term memory, appearance/dress, psychomotor activity, and speech quality were all within normal limits.  (*Id*.).  She was cooperative and appeared "clean and neat."  (*Id*.).  Her mood was dysthymic and affect blunt.  (*Id*.).  Schaeffer's insight, judgement, and level of impulse control were all fair.  (*Id*.).

Notes from September 18, 2017, indicate that Schaeffer called and asked to speak to a psychiatric provider.  (*Id*., PageID.889).  Schaeffer reported that she felt " 'trapped' in her home, with racing thoughts and heightened anxiety."  (*Id*.).

On October 24, 2017, Schaeffer was "admitted to the VA Bay Pine CSTS program to receive intensive impatient **therapy** for PTSD due to MST."  (*Id*., PageID.431) (emphasis and boldface in original).  However, she was discharged from the program days later, on October 30, 2017, after the staff received reports from other patients that Schaeffer sexually harassed them.  (*Id*., PageID.438, 460-461).  Schaeffer became "visibly distressed, angry, and tearful" upon learning of the discharge.  (*Id*., PageID.461).

Notes from Jennifer L. Yehl, M.D. indicated that on November 1, 2017, Schaeffer was admitted to Dr. Yehl's psychiatric impatient team for worsening anxiety after an alleged sexual assault by a male patient at a residential program. (*Id.*, PageID.423-424). Schaeffer recently stopped taking prazosin to prevent nightmares as she wanted to confront her nightmares rather than prevent them. (*Id.*, PageID.424). She kept a sketchbook where she illustrated her nightmares as a form of therapy. (*Id.*). Schaeffer reported "decreased sleep, guilt and decreased appetite." (*Id.*). She also reported "nightmares and constant thoughts about the sexual trauma that occurred during her service with the Army." (*Id.*).

On November 2, 2017, Dr. Yehl noted that Schaeffer had "fair grooming and hygiene," and that she was "tearful at times during interview, cooperative, and distractible at times." (*Id.*, PageID.426). Schaeffer's mood was " 'stressed' " and " 'anxious' " and her affect was "mildly dysthymic, congruent to stated mood." (*Id.*). Her thought form was "linear and goal directed, logical." (*Id.*). Both Schaeffer's insight and judgment were fair. (*Id.*, PageID.427). Dr. Yehl advised that Schaeffer should continue taking hydroxyzine for anxiety/insomnia, melatonin for insomnia, and paroxetine for depression/anxiety. (*Id.*, PageID.428).

Dr. Yehl discharged Schaeffer on November 7, 2017. (*Id.*, PageID.454). Schaeffer's discharge diagnoses were adjustment disorder with mixed anxiety and depressed mood, borderline personality disorder (by history),

alcohol/opioid/sedative use disorders (by history), unspecified depressive disorder (by history), panic disorder with agoraphobia (by history), and PTSD (MST) (by history). (*Id*.). It was noted that during her hospital stay, Schaeffer "was compliant with her treatment and receptive to the recommendations made by the treatment team." (*Id*., PageID.458). She was also cooperative with nurses, interacted well with other patients, and followed all rules and regulations. (*Id*.). Overall, her "mood stabilized and behavior was appropriate. [She] did not demonstrate any psychotic, aggressive, hostile, self-mutilatory or **suicidal** behavior while on the unit." (*Id*.) (emphasis and boldface in original).

Dr. Yehl noted that Schaeffer had "fair grooming and hygiene," and that she was "pleasant, cooperative." (*Id*., PageID.458). Schaeffer's mood was " '[g]ood' " and her affect was "euthymic, congruent to stated mood." (*Id*.). Her thought form was "linear and goal directed, logical." (*Id*.). Both Schaeffer's insight and judgment were fair. (*Id*.).

November 3, 2017, Schaeffer had a psychology consultation with Narine Karakashian because of depressive symptoms. (*Id*., PageID.339-340). Karakashian described Schaeffer's current diagnoses as adjustment disorder with mixed anxiety, depressed mood, and cannabis use disorder. (*Id*., PageID.340). Schaeffer's previous psychiatric diagnoses were borderline personality disorder,

alcohol/opioid/sedative use disorders, unspecified depressive disorder, panic

disorder with agoraphobia, and PTSD (MST).  (*Id*.).

Karakashian noted that Schaeffer was alert and fully oriented.  (*Id*.,

PageID.343).  Her eye contact and hygiene were fair, and speech was normal.

(*Id*.).  Schaeffer had a dysphoric mood with full range affect.  (*Id*.).  Her thought

process was goal oriented.  (*Id*.).  Schaeffer denied suicidal and homicidal

ideations.  (*Id*.).

Schaeffer reported to Karakashian that while at the residential PTSD/MST

program at the Bay Pines VA hospital, she befriended a male patient to whom she

disclosed that she was the survivor of being gang-raped in the military.  (*Id*.).  She

further reported that the male patient inappropriately touched her.  (*Id*.).  The male

patient and several other male patients reported Schaeffer for sexual harassment,

and she was discharged from the program.  (*Id*., PageID.340-341).

Schaeffer reported that her mental health began to worsen back in April

2017.  (*Id*., PageID.341).  At that time, she went home to Michigan to say good-

bye to her father who soon thereafter passed away.  (*Id*.).  The same day,

Schaeffer's brother died because of a self-inflicted gunshot wound.  (*Id*.).

Schaeffer was the first to respond to the scene.  (*Id*.).

On July 26, 2019, Dr. Barber completed a mental residual functional

capacity assessment report.  (*Id*., PageID.1176).  The report consists of a four-page

preprinted form on which he circles the degree of limitation he believed Schaeffer had in several work related restrictions.  He listed Schaeffer's diagnoses as PTSD, bipolar disorder, alcohol use disorder in remission, chronic pain syndrome, and seizure disorder.  (*Id.*).  Schaeffer's prognosis was guarded, and she was, "for the most part," compliant with treatment.  (*Id.*, PageID.1176-1177).

Dr. Barber opined that Schaeffer had extreme limitation in her abilities to:

- understand, remember, and carry out detailed instructions;
- carry out detailed instructions;
- maintain attention and concentration for extended periods;
- perform activities within a schedule, maintain regular attendance, and be punctual;
- sustain an ordinary routine without special supervision;
- work in coordination with or proximity to others without being distracted;
- complete a normal workday and week without interruption from psychologically based symptoms;
- perform at a consistent pace without an unreasonable number of and length of rest periods;
- respond appropriately to changes in work setting;
- set realistic goals or make plans independently of others; and
- tolerate normal levels of stress.


She had marked limitations in her abilities to:

- remember locations and work-like procedures;
- understand and remember, and carry out very short and simple instructions;
- make simple work-related decisions;
- interact appropriately with the general public;
- accept instructions and respond appropriately to criticism from supervisors;
- get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
- maintain socially appropriate behavior; and
- adhere to basic standards of neatness and cleanliness.

(*Id.*, PageID.1177-1179).  With the exception of being aware of hazards and using public transportation (in both of which Dr. Barber thought Schaeffer was moderately limited), Dr. Barber circled that Schaeffer had either marked or extreme limitation in every area he was asked to evaluate.  (*Id.*).  Dr. Barber also estimated that Schaeffer would miss over 14 days of work each month because of her mental impairments and was unable to sustain work.  (*Id.*, PageID.1179).  Dr. Barber did not supply any clinical records to support his findings.[4]

    III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

---

[4] Schaeffer also references a VA examination for PTSD performed by a Dr. Mastayayeva in her brief.  (ECF No. 15, PageID.1203).  Details of the examination are not included in the body of this Report because the examination occurred after Schaeffer's date of last insured.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Schaeffer was not disabled under the Act.  At Step One, the ALJ found that Schaeffer had not

20

engaged in substantial gainful activity from February 26, 2016 (alleged onset date)

through December 31, 2017 (date last insured).  (ECF No. 13, PageID.55).  At Step

Two, the ALJ found that she had the severe impairments of

osteoporosis/degenerative disc disease of the lumbar spine, degenerative joint

disease of the knees and ankles, right ankles/tarsal tunnel syndrome of the right

foot, PTSD, generalized anxiety disorder, and polysubstance disorder.  (*Id.*).  At

Step Three, the ALJ found that Schaeffer's impairments, whether considered alone

or in combination, did not meet or medically equal a listed impairment.  (*Id.*,

PageID.56-57).

The ALJ then assessed Schaeffer's RFC, concluding that she was capable of

performing

> sedentary work as defined in 20 CFR 404.1567(a) except she must be
> given the opportunity to stand for up to 5 minutes after sitting for 1 hour
> at a time.  She can do no more than occasional balancing, stooping,
> kneeling, crouching, and climbing ramps and stairs.  However, she can
> never climb ladders, ropes, or scaffold.  She must avoid unprotected
> heights and danger moving machinery.  [Schaeffer] must avoid
> overhead reaching with bilateral upper extremity.  She is limited to no
> more than occasional use of foot controls.  She is limited to simple
> routine tasks, not performed at production rate pace.  She is further
> limited to occupations that require no more than simple work related
> decision with no more than occasional changes in work setting and no
> more than occasional interact with supervisors, coworkers, and the
> public.

(*Id.*, PageID.58).

21

At Step Four, the ALJ found that Schaeffer was unable to perform any past relevant work. (*Id.*, PageID.61). At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Schaeffer was capable of performing the jobs of parimutuel-ticket checker/counter (1,500,000 jobs nationally), addresser/addressing clerk (65,000 jobs nationally), and surveillance system monitor (135,000 jobs nationally). (*Id.*, PageID.63). As a result, the ALJ concluded that Schaeffer was not disabled under the Act. (*Id.*).

## IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g). Although the court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one. Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision. *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence."  42

U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence
> to support the agency's factual determinations.   And whatever the
> meaning of substantial in other contexts, the threshold for such
> evidentiary sufficiency is not high.  Substantial evidence, this Court has
> said, is more than a mere scintilla.  It means—and means only—such
> relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the

judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc.*

*Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . .

. presupposes that there is a zone of choice within which the decisionmakers can go

either way, without interference by the courts.") (quoting *Blakley v. Comm'r of*

*Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are

therefore subject to multi-tiered review, but those findings are conclusive unless

the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The

Court must " 'take into account whatever in the record fairly detracts from [the]

weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395

(6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487

23

(1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotations omitted).

<h2 style="text-align:center">V.    Analysis</h2>

Schaeffer presents one primary argument on appeal, namely that the ALJ failed to properly evaluate the opinion of Dr. Barber.

Under the current regulations, the ALJ must articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record."  20 C.F.R. § 404.1520c(b).  The ALJ evaluates the persuasiveness of the medical opinions and prior administrative medical findings by utilizing the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors.  § 404.1520c(c).  Supportability and consistency are the most important

<div style="text-align:center">24</div>

factors and the ALJ must explain how he considered these factors in his decision.

§ 404.1520c(b)(2).

As detailed above, Dr. Barber, Schaeffer's treating psychiatrist, completed a

mental residual functional capacity assessment wherein he indicated that Schaeffer

had a number of marked and extreme limitations.  (ECF No. 13, PageID.1176-

1179).  The ALJ considered Dr. Barber's opinion and stated the following:

> Regarding the opinion of Dr. Barber, the undersigned is also
> unpersuaded.   Dr. Barber extreme limitations are unsupported by
> clinical findings.    Additionally,  they  are  inconsistent  with  the
> longitudinal evidence previously discussed, showing that [Schaeffer]
> was alert, oriented, and cooperative with fair insight and judgment,
> normal thought content, and normal mood and affect.

(*Id*., PageID.61 (internal citations omitted)).  The ALJ prefaced his discussion of

Dr. Barber's opinion with a detailed evaluation of the record evidence concerning

Schaeffer's mental health:

> In terms of [Schaeffer's] alleged mental functional limitations, the
> medical evidence of record establishes multiple diagnoses, including
> post-traumatic stress disorder, generalized anxiety disorder, and
> polysubstance abuse.  While these impairments cause mental functional
> limitations, the medical evidence of record does not establish inability
> to perform low stress unskilled work within the above parameters.
> Mental therapy records noted that [Schaeffer] appeared to be having a
> difficult time and her mood was described as labile.  In November 2017,
> she was admitted psychiatric inpatient treatment for worsening anxiety.
> Upon admission, she was noted to be tearful and distractible at times as
> well as having a stressed and anxious mood and a mildly dysthymic
> affect.  However, after brief treatment, [Schaeffer] was described as less
> anxious, confused, and fearful, and as seeming more calm, hopeful, and
> trusting.  She was noted as attentive.  Additionally, while [Schaeffer]
> was hospitalized, records note that upon discharge, she denied suicidal

ideation, intent, or plan, her mood was noted a good and her insight and judgment as fair.  Moreover, the mental status examination found her to be fairly groomed, cooperative, with no gross impairment with memory, attention, or language.  Indeed, [Schaeffer] has routinely been found to be in no alert, cooperative, oriented, with normal mood, affect, attention, concentration, memory, insight, and judgement.  Additionally, [Schaeffer] has normal neurological and musculoskeletal findings.  When viewed longitudinally, the medical evidence of record does not establish an inability to perform work within the above parameters.

Incidentally, the undersigned notes that, throughout the record, treatment records indicate that [Schaeffer] has on occasion been non-compliant with treatment, has missed therapy sessions, as has misused prescribed medication.  While the undersigned will not go so far as to consider [Schaeffer's] periods of non-compliance as a failure to follow medical advice as defined in 20 CFR 404.1530 and 416.930, [Schaeffer's] unwillingness to follow the recommendations of her treatment providers suggests that [Schaeffer's] symptoms are not as incapacitating as she alleges.

The undersigned also notes that the medical evidence of record is replete with evidence of polysubstance abuse.  For instance, in October 2016, [Schaeffer] reported that she drinks "a fifth per day."  Likewise, in March and May 2017, [Schaeffer] reported to treating physicians that she has been purchasing Vicodin pain medication on the streets illegally.  Nevertheless, she was noted as displaying no acute psychiatric concerns.  In August 2017, [Schaeffer] was assessed as fully capable of living independently in a residential treatment milieu with minimal supervision.  While the undersigned accounted for [Schaeffer's] substance abuse in determining her residual functional capacity, the undersigned notes that the above residual functional capacity would likely be even greater if [Schaeffer] abstained from substance abuse and remained compliant with treatment recommendations.

In addition to the above medical evidence of record, the undersigned considered non-medical evidence, including [Schaeffer's] activities of daily living.  At one point or another, either in the treatment records, the testimony at the hearing, or in the function report submitted by

[Schaeffer], the record documents activities including attending school/online classes, driving (prior to DUI), going to the beach, using airplane travel, cooking , performing household chores, and painting. While the undersigned acknowledges that [Schaeffer] has some limitations performing these activities, and while none of these activities is dispositive, taken together and considered in conjunction with the above medical evidence of record, they suggest that [Schaeffer] can perform work within the above parameters on a sustained and continuous basis.

(*Id.*, PageID.60-61).

As evidenced by the detailed and thorough discussion of the record, the ALJ carefully considered the evidence before discounting Dr. Barber's opinion. In doing so, the ALJ demonstrably utilized the most important factors of supportability and consistency. *See* § 404.1520c(b)(2). Furthermore, the ALJ's summation is fully supported by the undersigned's review of the record.

Schaeffer's most frequent provider was psychologist Roffer, not Dr. Barber. While Schaeffer's mood, affect, and stressors varied during appointments with Roffer, he always found her short- and long-term memory within normal limits and that her attention and concentration were almost always within normal limits. Further, Roffer almost always rated Schaeffer's insight, judgment, and level of impulse control as fair. When Roffer was able to evaluate Schaeffer's hygiene/grooming and appearance, he noted that they were within normal limits and that she appeared "clean and neat."

27

When Schaeffer's ability to attend a residential treatment program was assessed in August 2017, it was noted that she was "assessed by the primary therapist to be at no imminent risk for harm to self or others and is capable of living independently in a residential treatment milieu with minimal supervision." Moreover, after her discharge from a weeklong psychiatric hospitalization in November 2017, the discharging doctor noted that Schaeffer "was compliant with her treatment and receptive to the recommendations made by the treatment team." She was also cooperative with nurses, interacted well with other patients, and followed all rules and regulations.  Overall, her "mood stabilized and behavior was appropriate.  [She] did not demonstrate any psychotic, aggressive, hostile, self-mutilatory or **suicidal** behavior while on the unit."  The discharging doctor further noted that Schaeffer had "fair grooming and hygiene," and that she was "pleasant, cooperative."  Schaeffer's mood was " '[g]ood' " and her affect was "euthymic, congruent to stated mood."  Her thought form was "linear and goal directed, logical."  Both Schaeffer's insight and judgment were fair.

Therefore, the ALJ properly discounted Dr. Barber's opinion and his determination that Schaeffer is not disabled is supported by substantial evidence. This, however, is not to say that the undersigned believes Schaeffer to have no mental impairments.  The record establishes that Schaeffer suffers from severe

28

mental impairments and that the ALJ was thus correct to craft an RFC accounting for those impairments.

Moreover, in order to build "a logical bridge between the evidence and the conclusion[,]" the ALJ must provide more than " [a] 'cursory' or irrelevant analysis." *Weaver v. Comm'r of Soc. Sec.*, No. 16-cv-10942, 2017 WL 1212995, at *11-*12 (E.D. Mich. Jan. 20, 2017), *report and recommendation adopted*, 2017 WL 1055543 (E.D Mich. Mar. 21, 2017) (citation omitted).  Here, the ALJ did build a logical bridge between the RFC and the evidence as the ALJ's analysis was far from cursory or irrelevant.  The ALJ discussed Schaeffer's hearing testimony as well as her extensive treatment records from the VA.  The ALJ's consideration of this evidence was in accord with Social Security Ruling (SSR) 96-8p, which states that the narrative discussion should include discussion of the objective medical evidence as well as discussion of the claimant's complaints.  SSR 96-8p, 1996 WL 374184, at *7.  Therefore, contrary to Schaeffer's assertions, the ALJ did build a logical bridge between the evidence and conclusion.

Finally, to the extent that Schaeffer argues the ALJ erred by crafting an RFC that was not explicitly supported by a specific medical opinion because the ALJ could not interpret medical evidence, the argument is unavailing.  The Sixth Circuit has explained that "the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical

evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013); *see also Coldiron v. Comm'r of Soc. Sec.,* 391 F. App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ not a physician ultimately determines a claimant's RFC. . . . An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding."). The Sixth Circuit rejected arguments like Schaeffer's in both *Rudd* and *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017). In *Rudd*, the Sixth Circuit rejected the notion that the ALJ "interpret[ed] raw medical data beyond her ability" when the ALJ made conclusions that "were consistent with the technician's interpretation of the x-rays." *Rudd*, 531 F. App'x at 727. Meanwhile in *Shepard*, the Sixth Circuit rejected Shepard's argument that "the ALJ's RFC lacks substantial evidence because no physician opined that Shepard was capable of light work." *Shepard*, 705 F. App'x at 442.

In support of her position, Schaeffer cites *Wilson v. Comm'r of Soc. Sec.*, No. 13-cv-10158, 2013 WL 6078042 (E.D. Mich. Nov. 19, 2013) and *Guido v. Comm'r of Soc. Sec.*, No. 13-CV-13520, 2014 WL 4771929, at *13 (E.D. Mich. Sept. 24, 2014). *Wilson* is distinguishable and *Guido* is contradicted by *Rudd*. In *Wilson*, the court's analysis centered on the ALJ's improper assessment of the treating-source opinions in the record and the ALJ's error in disregarding a treating-source opinion when crafting the RFC. *Wilson*, at *6-*8. As explained

above, new regulations are now in effect concerning the evaluation of medical opinions and *Wilson*'s analysis under the old regulations is thus unhelpful. Meanwhile in *Guido*, the court noted that an ALJ may not "rely on her own evaluation of the raw medical evidence to determine whether a claimant meets or medically equals a listed impairment, or the functional limitations to be imposed upon such claimant." *Guido*, at *13. *Guido* is thus at odds with *Rudd* in which the Sixth Circuit determined that an ALJ could rely on x-rays that were interpreted by a technician in crafting the RFC because the interpretation of such "raw medical data" was not beyond her ability. *Rudd*, 531 F. App'x at 727. Accordingly, the Sixth Circuit has endorsed an ALJ's interpretation of raw medical data so long as a medical provider first interpreted the data. Therefore, the ALJ did not err when crafting the RFC.

Overall, the record shows that Schaeffer suffers from mental impairments. Her impairments were taken into consideration by the ALJ in crafting her RFC, which resulted in a finding that she is able to engage in work within the limitations of the RFC. The ALJ's decision is supported by substantial evidence. In short, the ALJ's determinations were within the "zone of choice" accorded to the fact-finder at the administrative hearing level and they should not be disturbed by this Court. *Blakley, supra,* 581 F.3d at 406.

## VI.    Conclusion

For the reasons set forth above, it is RECOMMENDED that the

Commissioner's motion be GRANTED, Schaeffer's motion be DENIED, and that

under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be

AFFIRMED.

Dated: February 9, 2022                    s/Kimberly G. Altman
Detroit, Michigan                          KIMBERLY G. ALTMAN
                                           United States Magistrate Judge

## <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 9, 2022.

<div style="margin-left:40%">

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager

</div>